# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Catherine Fox,                      :
                  Petitioner     :
                      :

          v.                  :     No. 409 C.D. 2020
                      :     Submitted:  September 4, 2020

Workers' Compensation Appeal    :
Board (Chestnut Hill Healthcare   :
Center),                      :
              Respondent   :


BEFORE:  HONORABLE P. KEVIN BROBSON, Judge[1]
              HONORABLE ANNE E. COVEY, Judge
              HONORABLE J. ANDREW CROMPTON, Judge


*OPINION NOT REPORTED*


**MEMORANDUM OPINION**
**BY JUDGE BROBSON**           **FILED:  January 27, 2021**


Catherine Fox (Claimant) petitions for review of an order of the Workers' Compensation Appeal Board (Board), dated April 1, 2020.  The Board affirmed an order of a Workers' Compensation Judge (WCJ), which denied Claimant's claim petition against Chestnut Hill Healthcare Center (Employer).  We now affirm.

## I.  BACKGROUND

Beginning in February or March 2016, Claimant worked for Employer as its chief executive officer and nursing home administrator.  (Reproduced Record (R.R.) at 65a.)  On or about November 15, 2016, Claimant began experiencing pain in her

---

[1] This case was assigned to the opinion writer prior to January 4, 2021, when Judge Brobson became President Judge.

upper back while using her computer at her desk at work, and, over the next few days, she developed pain, stiffness, and reduced range of motion in her neck. (*Id.* at 73a-74a.) On November 21, 2016, Claimant informed Employer that she was unable to work and sought medical treatment for her symptoms. (*Id.* at 75a-76a.) On December 19, 2016, Claimant filed a claim petition, seeking full disability benefits beginning November 21, 2016, and ongoing, and alleging that the symptoms she experienced beginning in mid-November 2016 constituted a work-related injury.[2] (*Id.* at 1a-4a.) Specifically, Claimant alleged that the subject injury is a work-related aggravation of head, neck, shoulder, and arm injuries she sustained prior to her work for Employer. (*Id.* at 2a.) Employer filed an answer denying all allegations in the claim petition. (*Id.* at 15a-18a.) The matter was assigned to a WCJ, who conducted a hearing.

At the hearing, Claimant testified that, beginning in 1995, many years prior to her employment with Employer, Claimant experienced persistent head and neck pain and restricted range of motion for which she received a treatment of regular Botox injections for approximately six years, from 1995 to 2001. (*Id.* at 67a-69a.) Claimant initially testified that she experienced no neck pain, restricted motion, or other neck problems from 2001 until 2016. (*Id.* at 69a.) On April 11, 2016, a few months after she began working for Employer, Claimant was injured in a non-work-related automobile accident. (*Id.* at 69a-71a, 227a.) She testified that the accident immediately caused "excruciating" pain in her neck and head, for which she sought and received emergency medical care. (*Id.* at 71a-72a.) Claimant stated

---

[2] Claimant also filed a penalty petition, which the WCJ denied at the same time she denied the claim petition. (R.R. at 8a-11a; WCJ's Decision at 12.) Claimant has not challenged the denial of her penalty petition on appeal, and, therefore, we do not address it in this opinion.

that she did not experience any neck pain after her emergency care, but she sought treatment from her primary care physician, Neil Mermelstein, D.O., before returning to work several days after the accident with no restrictions and no neck pain or problems. (*Id.* at 72a.)

Claimant further testified that she continued to perform her job duties without pain until on or about November 15, 2016, when she began to experience discomfort while working at her computer. (*Id.*) She explained that the discomfort began when she would turn her head to look at a document on her right side, next to the computer screen, which was on her left. (*Id.* at 73a.) The discomfort grew into "a sharp pain . . . [in] the upper left part of [Claimant's] back." (*Id.*) Over the next two or three days, Claimant experienced intermittent episodes of similar pain while at work and developed stiffness in the left side of her neck. (*Id.* at 73a-74a.) Claimant testified that this pain differed from the pain she experienced from 1995 to 2001 and the pain following the April 2016 accident. (*Id.* at 77a, 164a-68a.)

Claimant stated that, on Friday, November 18, 2016, she informed Employer's director of human resources, Tina Klein, of the pain and problems she was experiencing. (*Id.* at 74a.) Claimant recounted that, during their conversation, she experienced neck pain traveling down her left arm into her left hand and that Ms. Klein observed Claimant's head shaking when she turned her head to the left. (*Id.* at 74a-75a.) Claimant further testified that, upon hearing Claimant's description of her symptoms, Ms. Klein said she "should go home." (*Id.* at 75a.) Claimant stated that Ms. Klein expressed her belief that Claimant's symptoms were related to the setup of her desk and chair and that Ms. Klein contacted other human resources personnel of Employer about Claimant's injuries. (*Id.* at 83a.) Claimant also asserted that she had previously complained to her supervisor, Carol Pritchard, on

3

several occasions that her office chair did not fit her properly and was causing discomfort in her back. (*Id.* at 76a, 82a.) Claimant stated that on the following Monday, November 21, 2016, she made an appointment with Dr. Mermelstein and informed Ms. Klein and Ms. Pritchard that she would not report to work that day. (*Id.* at 75a-76a.)

Claimant explained that she has continued to experience the symptoms that began in mid-November 2016, including pain, stiffness, and muscle spasms in her back and neck and numbness in both hands. (*Id.* at 78a.) She has not returned to work since November 21, 2016. (*Id.* at 80a.) Claimant testified that, because of these symptoms, she is in constant, sometimes disabling pain and is often unable to sleep. (*Id.* at 158a-59a, 167a.) Concerning whether she is able to drive in her present condition, Claimant stated:

> A. Well I do drive but I'm - they would like me to not drive. So when I tell you I'm driving, that means I'm with another person that I go to my appointments - who takes me with [sic] to my appointments. So sometimes I will drive, but if I feel it's going really bad, I don't, because [my head] goes to the left and I can't see then.
>
> Q. Okay. Did you drive here today?
>
> A. That's the only time I would drive. No, my husband brought me.

(*Id.* at 170a.)

On cross-examination, Claimant sought to add to her earlier testimony, explaining other symptoms she had noticed on Friday, November 18, 2016, while at work. (*Id.* at 85a-87a.) She explained the nature and location of the pain and immobility she experienced beginning in 1995 and how it differed from the symptoms she experienced in November 2016. (*Id.* at 87a-92a.) Claimant had initially testified that her 1995 symptoms were the result of a viral infection, but, on

4

cross-examination, she stated that she was not sure what caused the pain, only that she and several of her acquaintances were ill with similar symptoms and believed they had contracted a virus. (*Id.* at 67a-68a, 95a-96a.) Claimant testified that her treating physician in 1995—Howard Hurtig, M.D.—diagnosed her with cervical dystonia. (*Id.* at 96a.) She stated that the pain resulting from the April 2016 accident resolved within one week and that she was not receiving further treatment for the accident at the time she ceased working in November 2016. (*Id.* at 96a-97a, 231a.) Claimant initially admitted that she had experienced neck problems, including her head shaking when turning to the left, continuously from 1995 until November 2016. (*Id.* at 98a.) When asked whether she believed she "always had" cervical dystonia and the associated neck problems, Claimant said that she was not sure her symptoms were caused by cervical dystonia but stated that she has experienced shaking in her neck continuously since 1995 and that the nature of her neck pain changed over time. (*Id.* at 98a-99a.) She then stated that she has "not had an issue with [her] neck since [she] stopped seeing Dr. Hurtig in 2001 or 2000." (*Id.* at 99a.) Throughout her testimony on cross-examination, however, Claimant admitted that she has taken the drug Klonopin for "movement disorders" continuously from 1995 to the present, as prescribed by Dr. Hurtig and Dr. Mermelstein.[3] (*Id.* at 97a, 99a-100a.) She also admitted that she recently began receiving the same type of injection treatment she had received for her neck problems from 1995 to 2001, although the injections are not administered in precisely the same locations or muscles as before. (*Id.* at 179a-81a.) Claimant also stated that, in addition to the pain, shaking, and range-of-motion issues she described on direct examination, she has recently

---

[3] Although Claimant initially testified that she has been taking Klonopin since 1995, in subsequent direct testimony she stated that she has been taking it since 1999. (R.R. at 219a-20a.)

5

complained to doctors that she experiences headaches, ringing in her ears, and a spinning sensation in her head and eyes. (*Id.* at 103a-04a.)

Claimant further admitted on cross-examination that she never personally completed a written report of her alleged work injury. (*Id.* at 174a-75a.) She emphasized that she expected Ms. Klein to complete the report and that Ms. Klein had expressed her belief that Claimant's injury was work related. (*Id.* at 175a.) Claimant recalled that Dr. Mermelstein wrote her a note excusing her from work, but she could not recall whether the note described Claimant's symptoms as a work injury or an underlying medical condition. (*Id.* at 176a.) Claimant admitted that she never told Dr. Mermelstein she believed her injury to be work related.[4] (*Id.* at 177a.)

In support of the claim petition, Claimant presented the testimony of Ms. Klein, who testified that she began working for Employer as human resources director on April 17 or 18, 2016—just a few days after Claimant's accident. (*Id.* at 132a.) Ms. Klein stated that, to her knowledge, Claimant missed only one week of work following the vehicle accident and made no complaints about

_____

[4] This admission by Claimant is consistent with the records of Dr. Mermelstein concerning his treatment of Claimant, which Claimant introduced in support of the claim petition and which do not indicate that Claimant ever asserted to Dr. Mermelstein that her injuries are work related. (*See* R.R. at 405a-08a.) Dr. Mermelstein's records indicate that Claimant sought treatment from him on May 2, 2016, complaining of pain in her neck, back, arms, and fingers, that Dr. Mermelstein diagnosed Claimant with injuries from an "accident," and that he prescribed various treatments including pain medication, physical therapy, x-rays, and a referral for orthopedic care. (*Id.* at 405a-06a.) When asked about the May 2, 2016 note, which appears to contradict Claimant's assertion that she saw Dr. Mermelstein only once approximately five days after the April 11, 2016 accident, Claimant stated that she "[didn't] remember" seeing him on May 2nd and appeared to deny that he issued the prescriptions indicated in the note. (*Id.* at 229a-30a.) Dr. Mermelstein's note from Claimant's November 22, 2016 appointment states that Claimant was suffering "persistent neck pain following her [motor vehicle accident]" and mentions no work-related cause of her injuries. (*Id.* at 408a.) When Employer's counsel asked Claimant about this apparent discrepancy on cross-examination, Claimant responded that she "[didn't] know why [Dr. Mermelstein] would put that in [the note]." (*Id.* at 230a-31a.)

6

problems with her neck, back, or head until mid-November 2016. (*Id.* at 134a-35a.) She confirmed that Claimant's desk setup required her to turn her head to the left frequently. (*Id.* at 135a-36a.) Ms. Klein explained that Claimant had complained of pain in her neck, upper back and shoulders during the workday, was often physically uncomfortable, and would experience shaking of her head on occasion. (*Id.*) Ms. Klein explained that she contacted Employer's human resources management company and insurance carrier about filing a workers' compensation report or claim after Claimant reported her symptoms in mid-November 2016. (*Id.* at 140a-42a.) She acknowledged, however, that she "didn't know" if Claimant's injuries were work related, never filed a report of a work-related injury for Claimant, and never saw evidence that anyone else had filed such a report. (*Id.* at 140a-42a, 151a.) On cross-examination, Ms. Klein stated that Claimant never described a single accident or other traumatic event that occurred at work and that Claimant's symptoms arose gradually as she performed her typical work. (*Id.* at 150a-51a.) Ms. Klein also admitted that she was responsible for filing work injury reports for Employer. (*Id.* at 151a.)

Claimant also presented the deposition testimony of Nirav Shah, M.D., who is a board-certified neurological surgeon. (*Id.* at 244a, 246a.) Dr. Shah testified that he first examined Claimant on January 20, 2017, when Claimant complained of what she characterized as a work-related repetitive motion injury to her neck. (*Id.* at 248a-49a.) Upon first treating Claimant, Dr. Shah noted her history and earlier diagnosis of cervical dystonia and her April 2016 accident. (*Id.* at 249a.) Dr. Shah explained that cervical dystonia is a musculoskeletal disorder that causes muscle tightening, which can result in stiffness, pain, and limited range of motion in the neck. (*Id.* at 251a.) He explained that the disease is most often (though not

always) idiopathic (*i.e.*, lacking an external cause) and congenital. (*Id.* at 252a.) He opined that Claimant made a full recovery prior to mid-November 2016, including from her cervical dystonia and any injury caused by the April 2016 accident. (*Id.* at 249a.) Upon examining Claimant in January 2017, he found objective evidence of cervical nerve injury and cervical trauma, including palpable spasms, arm weakness, and decreased sensation, which were confirmed by the magnetic resonance imaging (MRI) results he reviewed, showing aggravation in Claimant's neck and a protrusion between the C6-7 vertebrae. (*Id.* at 253a, 256a.) He did not, however, observe any shaking in Claimant's head or neck. (*Id.* at 265a.) These findings, he opined, are more consistent with cervical nerve damage caused by trauma than with cervical dystonia, which affects only the muscles. (*Id.* at 254a.) Regarding the specific cause of Claimant's injuries, Dr. Shah opined that Claimant's repetitive twisting of her neck to view her computer screen at work was a "viable" cause, and he believed that aspect of Claimant's work had aggravated her preexisting dystonia, resulting in her present symptoms. (*Id.* at 254a-56a.)

Dr. Shah further testified that he advised Claimant not to return to her position with Employer because doing so would likely worsen her condition, that he continued to treat her, and that he referred her to Jed Shapiro, M.D., for pain management. (*Id.* at 257a-58a.) He stated that, when he performed a second examination of Claimant on May 19, 2017, Claimant's symptoms and objective findings, as well as his causal opinion and medical advice, were unchanged. (*Id.* at 260a-62a.) Dr. Shah disagreed with the medical opinions offered by Employer's witnesses that Claimant did not suffer a work-related injury. (*Id.* at 263a-68a.) He specifically opined that dystonia can often be "set off" by

8

repetitive activities and that Claimant exhibits radiculopathy that is distinct from her dystonia. (*Id.* at 267a.)

On cross-examination, Dr. Shah agreed that no single, traumatic event at work caused Claimant's injuries. (*Id.* at 272a.) Instead, he opined, multiple repetitive actions (such as turning to look to the left) aggravated her preexisting dystonia over time. (*Id.* at 272a-73a.) Dr. Shah was aware that Claimant continually took Klonopin before and after the alleged work injury to treat and prevent dystonia. (*Id.* at 271a, 274a, 297a-99a.) He explained that it is not surprising that Claimant's condition has not improved since she stopped working, because aggravation injuries often do not return to the baseline level of the preexisting injury and because Claimant has not yet completed all treatment options. (*Id.* at 276a-79a.) Dr. Shah admitted that cervical dystonia can worsen without any external or traumatic cause, but he reaffirmed his opinion that Claimant's injuries are most likely work related given Claimant's explanation of her repetitive motions at work. (*Id.* at 281a.) He admitted that Claimant suffered from post-concussive syndrome after she sustained a head injury in the April 2016 accident, which likely caused some of the symptoms Claimant reported, such as dizziness and ringing in her ears. (*Id.* at 290a-91a.) He explained that those symptoms would not be caused by dystonia or radiculopathy. (*Id.* at 291a.) He further opined that Claimant's current neck pain and motion problems are related to her work injury, not her traumatic head injury. (*Id.*)

Claimant also presented the deposition testimony of Dr. Shapiro, who is board certified in anesthesiology. (*Id.* at 342a.) He testified that Claimant was experiencing significant, continuous pain when he began treating her for pain relief on January 31, 2017. (*Id.* at 346a, 349a.) At that time, Dr. Shapiro diagnosed

9

Claimant with cervicalgia (generalized neck pain), cervical sprain and strain, and cervical radiculopathy. (*Id.* at 352a-53a.) He also diagnosed Claimant with a sprain/strain and internal derangement of both shoulders, caused by pathology or trauma, which, he opined, caused the pain and weakness he observed in her shoulders upon examination. (*Id.*) He did not impose specific work restrictions, but he recommended that Claimant avoid repetitive bending and heavy lifting. (*Id.* at 354a.) As to the cause of Claimant's injuries, Dr. Shapiro first observed that cervical dystonia often has no known cause, but then he gave his medical opinion that Claimant's injuries were caused by her work activities. (*Id.* at 356a, 365a.) He further opined that Claimant had fully recovered from any preexisting neurological injuries before mid-November 2016, and he disagreed with the medical testimony to the contrary offered by Employer. (*Id.* at 366a-70a.)

On cross-examination, Dr. Shapiro acknowledged that he has no record of Claimant telling him that her injuries were caused by repetitive actions at work. (*Id.* at 372a.) He also admitted that, according to his records, Claimant has not undergone physical therapy as he recommended. (*Id.* at 376a.) He acknowledged that his records sometimes differ from Claimant's testimony as to the efficacy of the pain-relieving injections he administered. (*Id.* at 377a-79a.) Finally, he stated that Claimant continues to drive, at least occasionally, despite her injuries. (*Id.* at 380a.)

In opposition to the claim petition, Employer presented the deposition testimony of Richard H. Bennett, M.D., who is board certified in neurology and electromyography. (*Id.* at 415a, 417a.) Dr. Bennett performed an independent medical examination (IME) of Claimant on May 22, 2017. (*Id.* at 418a.) He took Claimant's medical history, including her description of the April 2016 accident and her report of a work-related aggravation of the symptoms in her neck, which

10

occurred in mid-November 2016. (*Id.* at 419a.) Upon physical examination, Dr. Bennett found Claimant to have normal strength, sensation, and neurological function. (*Id.* at 422a.) He noted tightness and spasms in Claimant's neck muscles and intermittent, involuntary shaking of her head, but he was unable to relate those symptoms to any particular trauma-related issue, given that he found her neurological function to be objectively normal. (*Id.* at 422a-23a.) Dr. Bennett opined that Claimant's MRI results, which he reviewed during the IME, showed age-related arthritis, osteoarthritis, and impingement, which he characterized as "normal finding[s]." (*Id.* at 425a.) Based on the IME, Dr. Bennett opined that Claimant did not suffer a work-related injury and that her injuries are fully explained by her preexisting, incurable cervical dystonia, which expectedly comes and goes over time and is entirely unrelated to her work. (*Id.* at 426a, 428a, 436a.) He added that he does not believe work restrictions are appropriate for Claimant to prevent injury and that any difficulty she suffers due to movement at work is due to her preexisting cervical dystonia, not a work injury. (*Id.* at 426a-27a, 448a.) Contrary to the medical testimony offered by Claimant's witnesses, Dr. Bennett opined that Claimant does not have any symptoms of cervical radiculopathy and that the cervicalgia with which she was diagnosed was merely a general description of neck pain, not a specific condition or injury. (*Id.* at 427a-28a.)

On cross-examination, Dr. Bennett admitted that, when opining on Claimant's fitness to return to work, he had no knowledge of her working conditions or job duties. (*Id.* at 432a.) He clarified his earlier testimony, however, by stating that she could return to work at a sedentary office job similar to the one she performed for Employer. (*Id.*) He also explained that, in his opinion, Claimant's cervical dystonia was present since birth, was likely caused by a genetic predisposition, and was

11

certainly not caused by a viral infection, as Claimant testified. (*Id.* at 434a-35a.) Dr. Bennett acknowledged that Claimant told him she last received treatment for cervical dystonia in 2000, but he emphasized that he could not verify that independently. (*Id.* at 432a-33a.) He reaffirmed his opinion that Claimant's cervical dystonia is a congenital condition that will wax and wane on its own, regardless of whether Claimant receives injections or takes Klonopin and that the worsening of her symptoms in November 2016 had "nothing to do with her work activities." (*Id.* at 433a-34a, 436a.)

Employer also presented the deposition testimony of David L. Glaser, M.D., a board-certified orthopedic surgeon, who performed an IME of Claimant on April 12, 2017. (*Id.* at 452a-54a.) During the IME, Dr. Glaser observed intermittent head shaking but normal strength, range of motion, and neurological findings in Claimant's neck and shoulders. (*Id.* at 455a.) He observed no spasms or other objective findings of illness in Claimant. (*Id.*) Dr. Glaser opined that the diagnoses other physicians made of Claimant's condition (including cervicalgia and cervical dystonia) were nonspecific and not based on an accurate medical history of Claimant, and he opined that she did not suffer any injury related to her work in mid-November 2016. (*Id.* at 456a-57a, 459a.) He based this opinion on Claimant's MRI and objective IME findings, which he characterized as "normal" and "not consistent with a work-related problem[,]" and on Claimant's medical history. (*Id.* at 457a.) He noted that, in his view, nothing in Claimant's own account of her medical history or in her medical records suggests a work-related mechanism that could cause her current symptoms, and she is able to return to full-duty work without restrictions. (*Id.*) He also opined that the head shaking he observed in Claimant was "volitional[,]" or an instance where Claimant was intentionally magnifying her

12

symptoms. (*Id.*) He specifically disagreed with Dr. Shapiro's opinion that the shaking was beyond Claimant's control, opining that no known type of involuntary muscle contraction can cause that exact movement. (*Id.* at 458a.) Finally, upon reviewing Dr. Mermelstein's records, Dr. Glaser observed that the medical history Claimant gave him was inconsistent with those records. (*Id.*) Specifically, he observed that the records indicate Claimant sought treatment after the April 2016 accident for an extended period of time thereafter, rather than only initially, as she had reported to him. (*Id.*) He also noted that Dr. Mermelstein's records described Claimant's symptoms in mid-November as resulting from the accident, and they do not mention any relation between Claimant's work and her injuries. (*Id.*) Based on these observations, Dr. Glaser concluded that the medical history Claimant gave him was not accurate. (*Id.*)

On cross-examination, Dr. Glaser testified that Claimant never articulated to him a belief that her injuries arose from repetitive activities at work, although he admitted that Claimant did briefly mention turning her head while at work. (*Id.* at 462a.) He emphasized that the medical expert testimony presented by Claimant is based on the medical history she provided, which, in his opinion, is inaccurate and conflicts with Dr. Mermelstein's records. (*Id.*) To clarify his earlier testimony suggesting Claimant magnified her symptoms, Dr. Glaser testified that, to the extent Claimant does have genuine residual symptoms from the 2016 accident or some other cause, Claimant's work activities did not aggravate those preexisting injuries. (*Id.* at 464a.)

By decision and order dated February 1, 2019, the WCJ denied Claimant's claim petition. In so doing, the WCJ made the following relevant credibility determinations and factual findings:

13

7. The undersigned . . . finds [Claimant's] testimony entirely not credible. The undersigned had three opportunities to observe Claimant as she testified and her demeanor and responses belie her allegations of a work[-]related injury. Claimant's answers were consistently rambling, often off topic, and regularly lacking in complete sentences. This signals . . . an effort to search for what one would think were appropriate answers, rather than a situation where an individual relays a factual scenario that happened to that person. In addition, her histories to medical professionals have varied significantly, her recovery from the motor vehicle accident is questionable, particularly in light of Dr. Mermelstein's records, and her asserted recovery from cervical dystonia as of 2000[] is belied by her daily use of Klonopin to control that condition. The fact that Claimant continued to drive, and with medical approval, for so long when she asserted that her head would get stuck and she would not be able to see, belies the severity of her complaints. Claimant contradicted herself at times during her testimony. Finally, the alleged mechanism of injury does not support her plethora of complaints.

8. The undersigned . . . finds [Ms. Klein's] testimony not relevant as Claimant never reported a work[-]related injury to Ms. Klein.

9. The undersigned . . . finds the testimony of Dr. Bennett and Dr. Glaser more competent and credible than the testimony of Dr. Shah and Dr. Shapiro. Claimant's medical professionals relied on Claimant's history, which is not credible. Dr. Shapiro and Claimant offered different accounts of how his injections worked. Dr. Shapiro related all Claimant's complaints to the alleged work[-]related injury, while Dr. Shah relates some to ongoing concussion symptoms from the motor vehicle accident, from which Claimant asserts she fully recovered. Initially, Dr. Shapiro found a distinct shoulder injury, but indicated that upon reflection and further discussion with Claimant this was not the case. . . .

10. Claimant did not sustain a November 21, 2016 work[-]related injury.

(WCJ's Decision at 10.) Based on these credibility determinations and findings, the WCJ concluded that "Claimant . . . failed to meet her burden to prove that she sustained a November 21, 2016 work[-]related injury." (*Id.* at 11.) Claimant

14

appealed the WCJ's decision to the Board, and the Board affirmed. Claimant now petitions this Court for review.

## II. ARGUMENTS

On appeal,[5] Claimant argues that the Board erred in affirming the WCJ's decision denying Claimant's claim petition because: (1) there is not substantial evidence of record to support the WCJ's finding that Claimant did not sustain a work-related injury on November 21, 2016; (2) the WCJ capriciously disregarded Ms. Klein's testimony; and (3) the WCJ erred in failing to give a sufficient explanation for her decision not to credit Claimant's testimony.[6]

## III. DISCUSSION

### A. Substantial Evidence

Generally, in much of her brief, Claimant presents far-ranging arguments that the testimony she presented adequately supports the claim petition. Concerning substantial evidence for the WCJ's decision, Claimant asserts that Dr. Bennett's testimony, which the WCJ credited, undermines the WCJ's decision and is not substantial evidence. Specifically, she first claims that her continuous use of Klonopin from 2000 to 2016 is evidence of her recovery during that time (not of her continued illness), because Dr. Bennett admitted that new episodes of cervical dystonia might occur regardless of her use of Klonopin. Second, Claimant emphasizes Dr. Bennett's admission that there is no record of Claimant receiving

---

[5] This Court's review is limited to a determination of whether an error of law was committed, whether findings of fact are supported by substantial evidence, or whether constitutional rights were violated. Section 704 of the Administrative Agency Law, 2 Pa. C.S. § 704.

[6] We have reordered Claimant's arguments on appeal for purposes of discussion and disposition.

15

other treatment between 2000 and November 2016, which further undermines the WCJ's conclusion that she did not recover before 2016. Third, Claimant argues that Dr. Bennett did not explain why Claimant's symptoms worsened in November 2016 or why he suggested work restrictions, if her injuries were not related to her job duties. In addition to her arguments concerning Dr. Bennett's testimony, Claimant challenges the WCJ's finding that she did not recover from the April 2016 accident, because, she alleges, she was only out of work for one week after the accident and there is no evidence of her seeking other treatment between April and November 2016. Finally, Claimant argues that the WCJ's finding that she continues to drive is not supported by substantial evidence.

In response, Employer argues that the record contains substantial evidence that Claimant received treatment for cervical dystonia before November 2016. Employer emphasizes that all four testifying physicians concluded that Claimant's preexisting cervical dystonia is a congenital condition, not caused by trauma, which is expected to wax and wane over time. Employer points out that Claimant does not acknowledge or specifically challenge the WCJ's decision to credit the medical testimony offered by Employer (*i.e.*, that the worsening of Claimant's symptoms was not work related), and not to credit the testimony of Dr. Shah and Dr. Shapiro— a decision that was within the WCJ's discretion. Employer also points out that Claimant does not challenge the testimony and opinion of Dr. Glaser, who, unlike Dr. Shah and Dr. Shapiro, reviewed Dr. Mermelstein's records showing that Claimant received treatment for the April 2016 accident over an extended period. Thus, Employer asserts, whether the testimony offered by Claimant supports a contrary result is not relevant because the WCJ's decision is supported by substantial evidence credited by the WCJ.

16

In workers' compensation proceedings, it is well settled that the WCJ is the ultimate finder of fact. *Williams v. Workers' Comp. Appeal Bd. (USX Corp.-Fairless Works)*, 862 A.2d 137, 143 (Pa. Cmwlth. 2004). As factfinder, matters of credibility, conflicting medical evidence, and evidentiary weight are within the WCJ's exclusive province. *Id.* If the WCJ's findings are supported by substantial evidence, they are binding on appeal. *Agresta v. Workers' Comp. Appeal Bd. (Borough of Mechanicsburg)*, 850 A.2d 890, 893 (Pa. Cmwlth. 2004). Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a finding. *Mrs. Smith's Frozen Foods Co. v. Workmen's Comp. Appeal Bd. (Clouser)*, 539 A.2d 11, 14 (Pa. Cmwlth. 1988). In determining whether the WCJ's findings are supported by substantial evidence, we may not reweigh the evidence or the credibility of the witnesses but must "simply determine whether the WCJ's findings have the requisite measure of support in the record as a whole." *Elk Mountain Ski Resort, Inc. v. Workers' Comp. Appeal Bd. (Tietz, deceased)*, 114 A.3d 27, 32 n.5 (Pa. Cmwlth. 2015). It is irrelevant whether there is evidence in the record to support a contrary finding; if substantial evidence supports the WCJ's necessary findings, we may not disturb those findings on appeal. *Williams*, 862 A.2d at 143-44.

It is also well settled that with respect to a claim petition, the claimant bears the burden of proving all elements necessary for an award. *Inglis House v. Workmen's Comp. Appeal Bd. (Reedy)*, 634 A.2d 592, 595 (Pa. 1993). Pursuant to Section 301(c)(1) of the Workers' Compensation Act (Act),[7] an employee's injuries are compensable if they "(1) arise[] in the course of employment and (2) [are] causally related thereto." *ICT Grp. v. Workers' Comp. Appeal Bd. (Churchray-Woytunick)*, 995 A.2d 927, 930 (Pa. Cmwlth. 2010).

[7] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 411(1).

17

"Unequivocal medical evidence is required where it is not obvious that an injury is causally related to the work incident." *City of Pittsburgh v. Workers' Comp. Appeal Bd. (Wilson)*, 11 A.3d 1071, 1075 (Pa. Cmwlth. 2011).

Here, much of Claimant's argument on appeal simply asserts that the testimony she offered supports the claim petition. The WCJ, however, declined to credit that testimony and denied the claim petition. We may not revisit the WCJ's credibility determinations on appeal, and it is irrelevant whether evidence in the record might support a finding or conclusion contrary to those that the WCJ actually made. *Williams*, 862 A.2d at 143-44. Instead, we focus on the portions of Claimant's argument concerning support for the WCJ's findings and conclusions.

Claimant initially contends that Dr. Bennett's testimony is not substantial evidence because it contains statements or admissions directly contradicting the WCJ's findings. We disagree. Dr. Bennett's opinion concerning Klonopin, when viewed in context, merely stated that Claimant's use of Klonopin would not *increase* her risk of cervical dystonia—he did not state that Claimant's use of Klonopin was unrelated to her *preexisting* dystonia. (R.R. at 433a-34a.) To the contrary, he admitted that it was "certainly possible" that Claimant was taking Klonopin to treat her preexisting cervical dystonia, and he never stated or suggested that Claimant's use of Klonopin shows that she recovered from any injury, as Claimant appears to assert. (*Id.* at 433a.) Dr. Bennett also discussed Claimant's treatment history before 2016, but, contrary to Claimant's view, he never directly opined whether Claimant actually received treatment for dystonia between 2000 and 2016. Instead, he stated that, based only on "what [Claimant] said" to him about her history, she had most recently been treated for dystonia in 2000. (*Id.* at 432a-33a.) He immediately acknowledged, however, that he "d[idn't] know" and "c[ouldn't]

18

verify that" independently. (*Id.* at 433a.) Contrary to Claimant's assertion, Dr. Bennett clearly identified a cause of Claimant's worsening symptoms that is unrelated to her work—*i.e.*, preexisting cervical dystonia, which is expected to wax and wane over time without any external cause. (*Id.* at 436a.) Finally, Dr. Bennett was clear that he recommended a sedentary position for Claimant only "to allow [Claimant] to function at the maximal level" given her preexisting injuries and that "[o]ngoing complaints or work restrictions . . . do not appear to be directly related to a work injury." (*Id.* at 448a.) Based on the foregoing observations, Dr. Bennett's testimony, which the WCJ credited, provides substantial evidence for the WCJ's findings that Claimant did not recover from cervical dystonia before November 2016 and that her injuries are not work related.

Next, Claimant alleges that no evidence in the record supports the WCJ's finding that Claimant did not recover from the April 2016 accident before mid-November 2016. Claimant insists that there is no evidence of her seeking treatment for injuries from the accident between April and November 2016. Again, we disagree. Dr. Mermelstein's records, which Claimant submitted as evidence, note that Claimant sought treatment for injuries from an "accident" on May 2, 2016, and characterize Claimant's symptoms on November 22, 2016, as "persistent neck pain following her [motor vehicle accident]." (*Id.* at 405a-06a, 408a.) When offered the opportunity to testify about these records, Claimant offered no explanation, stating only that she disagreed with, or did not understand, the content of Dr. Mermelstein's records. (*Id.* at 229a-31a.) Thus, we conclude that Dr. Mermelstein's records support the WCJ's conclusion that Claimant continued to seek treatment for, and was not recovered from, the injuries she sustained in the April 2016 accident as of November 21, 2016.

19

Finally, Claimant essentially argues that the WCJ's finding that she continues to drive is not supported by substantial evidence. On direct examination, Claimant offered equivocal testimony about her driving habits, first stating that she "do[es] drive," but then, recognizing that she should not drive, she stated: "[w]hen I tell you I'm driving, that means I'm with another person . . . ." (*Id.* at 170a.) Ultimately, Claimant admitted that "sometimes [she] will drive[.]" (*Id.*) Both Dr. Shapiro and Dr. Bennett testified that Claimant continues to drive, at least occasionally, despite her injuries. (*Id.* at 380a, 421a, 446a.) Thus, the WCJ's finding that Claimant continues to drive is supported by substantial evidence of record.

For the foregoing reasons, we cannot conclude that the WCJ's decision was not supported by substantial evidence. This is true notwithstanding Claimant's requests that we reweigh the evidence, find credited testimony unpersuasive, or credit the testimony she offered—decisions that are within the exclusive province of the WCJ as factfinder, not of this Court. *See Williams*, 862 A.2d at 143-44.

### B. Capricious Disregard

Claimant next argues that the WCJ capriciously disregarded the testimony of Ms. Klein. Claimant asserts that Ms. Klein's testimony is relevant because it corroborates Claimant's testimony about the onset date of her injuries, and it shows that Ms. Klein understood Claimant's injuries to be work related. Specifically, Claimant relies on Ms. Klein's communications with Employer's insurance and human resources personnel about Claimant's injuries to establish that Claimant reported her injuries to Employer and, further, that the injuries were work related.

Although a WCJ is free to make credibility determinations, the WCJ cannot capriciously disregard competent, relevant evidence, and "[c]apricious disregard is

20

found when the fact[]finder ignores relevant, competent evidence." *Armitage v. Workers' Comp. Appeal Bd. (Gurtler Chems.)*, 842 A.2d 516, 519 n.4 (Pa. Cmwlth. 2004). When determining whether testimony is relevant, we note that where the causal connection between a claimant's injury and her work is not obvious (such as in the instant matter), the claimant must demonstrate that connection by unequivocal *medical* testimony. *City of Pittsburgh*, 11 A.3d at 1075. Accordingly, lay testimony about the medical cause of a claimant's injury is not relevant to the WCJ's findings regarding causation. *Cromie v. Workmen's Comp. Appeal Bd. (Anchor Hocking Corp.)*, 600 A.2d 677, 679 (Pa. Cmwlth. 1991); *Acme Standex v. Workers' Comp. Appeal Bd. (Gomez & Roma Aluminum Co.)* (Pa. Cmwlth., No. 1397 C.D. 2017, filed Nov. 20, 2018), slip op. at 21.[8]

The WCJ initially noted (and did not ignore) the portions of Ms. Klein's testimony concerning the symptoms Claimant reported to her. (*See* WCJ's Decision at 5.) When determining whether Claimant's injuries were work related, the WCJ properly disregarded Ms. Klein's testimony because it was not *medical* testimony, and was, therefore, irrelevant to determining the cause of Claimant's injuries.[9] *See Cromie*, 600 A.2d at 679; *Acme*, slip op. at 21. Accordingly, we conclude that the WCJ did not capriciously disregard Ms. Klein's testimony, because the WCJ did not ignore the relevant portions of her testimony and properly disregarded the irrelevant portions thereof. *See Armitage*, 842 A.2d at 519 n.4.

---

[8] Pursuant to Section 414(a) of this Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a), an unreported panel decision issued by this Court after January 15, 2008, may be cited "for its persuasive value, but not as binding precedent."

[9] Additionally, we note that Claimant appears to have mischaracterized Ms. Klein's testimony concerning the cause of Claimant's injuries. When Ms. Klein was finally permitted to answer after numerous objections to her testimony on grounds of relevance and competence, she simply stated: "I didn't know if this [injury] was work[ ]related or not." (R.R. at 142a.)

## C. Explanation of Credibility Determination

Claimant argues that the WCJ erred by failing to explain in sufficient detail why the WCJ did not credit Claimant's testimony. Claimant notes the WCJ's statements that Claimant gave rambling, incomplete, or off-topic answers to questions or gave inconsistent medical history to providers. She asserts, however, that the WCJ erred in failing to cite specific examples of these alleged shortcomings in her testimony. In response, Employer argues that, because the WCJ was able to observe Claimant's demeanor during her testimony on three occasions, the WCJ was free to accept or reject that testimony without the need to provide a detailed explanation for that decision. Employer also points out that the WCJ, although not legally required to do so, identified specific inconsistencies between Claimant's testimony and the other evidence she offered, including Dr. Mermelstein's records and the testimony of her physicians about the medical history she provided to them.

Section 422(a) of the Act, 77 P.S. § 834, provides, in pertinent part, that all parties in a workers' compensation case are "entitled to a reasoned decision[,]" and that "[w]hen faced with conflicting evidence, the [WCJ] must adequately explain the reasons for rejecting or discrediting competent evidence." In interpreting this requirement, the Pennsylvania Supreme Court has held that "when the issue involves the credibility of contradictory witnesses who have actually testified before the WCJ, it is appropriate for the [WCJ] to base his or her determination upon the demeanor of the witnesses." *Daniels v. Workers' Comp. Appeal Bd. (Tristate Transp.)*, 828 A.2d 1043, 1052-53 (Pa. 2003). Because "[s]uch a credibility determination may involve nothing more than the fact[]finder's on-the-spot, and oftentimes instinctive, determination that one witness is more [or less] credible[,]" a WCJ's

22

direct observation of a witness's testimony, combined with the WCJ's credibility conclusion, is often sufficient to render that credibility determination adequately reasoned. *Id.* at 1053. Our Supreme Court has stated that Section 422(a) does not require that WCJs "explain inherently subjective credibility decisions according to some formulaic rubric or detailed to the 'nth degree.'" *Id.*

Here, as noted in her decision, the WCJ directly observed Claimant's testimony at three separate hearings. The WCJ then summarized that testimony and concluded that it was not credible on the basis of Claimant's demeanor, which suggested to the WCJ that Claimant was "search[ing] for . . . appropriate answers, rather than . . . relay[ing] a factual scenario that happened to" her. (WCJ's Decision at 10.) Although this explanation might have been sufficient for a reasoned decision under *Daniels* because the WCJ directly observed Claimant's testimony, the WCJ went further. She explained that she declined to credit Claimant's testimony based on other, more credible evidence in the record, including inconsistent medical histories Claimant provided in the past, Dr. Mermelstein's records (which contradict Claimant's testimony regarding her recovery from the April 2016 accident), Claimant's continued use of Klonopin, and testimony that Claimant continues to drive despite her condition. (*Id.*) The WCJ also noted that "Claimant contradicted herself at times during her testimony." (*Id.*) We disagree with Claimant's assertion that the WCJ was obligated to list detailed, specific examples to support the several objective rationales she articulated for declining to credit Claimant's testimony. We find no such requirement in our decisions applying Section 422(a) of the Act, and, to the contrary, we note our Supreme Court's statement that Section 422(a) allows a WCJ to determine witness credibility based on direct observation without wading into minute detail. *Daniels*, 828 A.2d at 1053. Based on the numerous

objective rationales the WCJ articulated, which are supported by evidence in the record and may well go beyond the minimal explanation required for directly observed testimony under *Daniels*, her decision not to credit Claimant's testimony was adequately explained and "reasoned" as required by Section 422(a) of the Act.

## IV. CONCLUSION

For the reasons set forth above, we conclude that there is substantial evidence of record to support the WCJ's findings and her conclusion that Claimant failed to meet her burden of proving that she sustained a work-related injury on November 21, 2016. We further conclude that the WCJ did not capriciously disregard competent, relevant testimony or fail to explain her credibility determinations adequately. Accordingly, we affirm the Board's order.

P. KEVIN BROBSON, Judge

24

**IN THE COMMONWEALTH COURT OF PENNSYLVANIA**

Catherine Fox,                                   :
                Petitioner          :
                          :
        v.                                    :    No. 409 C.D. 2020
                          :
Workers' Compensation Appeal         :
Board (Chestnut Hill Healthcare       :
Center),                                          :
                Respondent        :

## **O R D E R**

AND NOW, this 27th day of January, 2021, the order of the Workers' Compensation Appeal Board is AFFIRMED.

 

                                           _____

                                         P. KEVIN BROBSON, Judge